UNITED STATES

v.

Second Lieutenant James H. RICE, Jr., 455–78–7767 FR, United States Air Force.

ACM 23506 (f rev).

U.S. Air Force Court of Military Review.

Sentence Adjudged 18 Feb. 1982.

Decided 20 June 1985.

Appellate Counsel for the Accused: Mr. Jay D. Terry, Esq., Dallas, Texas, Colonel George R. Stevens, Major Alexander S. Nicholas and Captain Timothy J. Malloy.

Appellate Counsel for the United States: Colonel James P. Porter, Colonel Kenneth R. Rengert, Major George D. Cato, Major Michael J. Hoover, and Major Robert E. Ferencik, Jr.

Before RAICHLE, CANELLOS and CARPARELLI Appellate Military Judges.

## DECISION

RAICHLE, Senior Judge:

The accused was convicted, pursuant to his pleas of guilty, of unpremeditated murder and assault with a dangerous weapon, in violation of Articles 118 and 128, U.C.M.J., 10 U.S.C.A. §§ 918, 928. The approved sentence extends to dismissal from the service, forfeiture of all pay and allowances, and confinement at hard labor for life.

### I

The facts, as stipulated by the parties, are as follows. Both the accused and the deceased, Lieutenant Scherp, resided in the Bachelor Officer Quarters at Laughlin Air Force Base, Texas. At approximately 0230 hours on 6 July 1981 the accused went to Lieutenant Scherp's room. He was upset with Lieutenant Scherp and wanted to confront him about certain remarks the deceased had made a few days before. When he entered Lieutenant Scherp's room he was carrying a .45 caliber automatic pistol and an ammunition clip. The accused was in Lieutenant Scherp's room approximately one hour during which time a fight occurred. At some point during the hour the accused tied the deceased's hands behind his back. The deceased screamed for help for approximately thirty to sixty seconds. These screams were heard by a neighbor who called the Security Police at about 0330 hours. At some point during the fight, the accused, with intent to inflict grievous bodily harm, placed his arm around the deceased's neck in a choke hold and kept the hold until the deceased died. Shortly thereafter, two Security Policemen arrived at the door of the deceased's room, knocked on the door and identified them-

selves. The accused turned off the room light and put a round of ammunition into the pistol. One of the Security Policemen, Staff Sergeant Flowers, took a position near the guardrail on the second floor overlooking the deceased's room. The accused, in an attempt to escape, climbed through the window. He was spotted by Sergeant Flowers who ordered him to halt. The accused fired at Staff Sergeant Flowers with his pistol and retreated back into the room.

At approximately 0500 hours a hostage-negotiation team was dispatched to the BOQ area, headed by Captain David L. Herres. During two conversations over the next hour, the accused telephonically advised Captain Herres that he did have a hostage who was a little hurt but would not require an ambulance. Additional conversations between the accused and Captain Herres ensued until the accused finally indicated he was willing to surrender. At this point, Captain Herres asked the accused about the hostage and was told, "I do not know how he is, but he is not breathing anymore." At approximately 0630 hours the accused surrendered to the Security Police. The deceased was found lying on the bed in his room and a .45 caliber cartridge case was found under the window from which the accused had fired at Sergeant Flowers.

Charges of premeditated murder and assault with a dangerous weapon were preferred, the case was referred as capital, and trial commenced on 2 February 1982. A number of motions were litigated and ruled upon, pleas of not guilty were entered, and *voir dire* of four court members was accomplished. These proceedings lasted through 4 February, at which time the case was continued until 10 February because of a death in the military judge's family. During this interim period, discussions regarding a pretrial plea agreement with the convening authority occurred wherein the accused, through his counsel, orally offered to plead guilty if the government would withdraw the premeditated murder charge and substitute the lesser-included offense of unpremeditated murder.

The principal effect would be to make the case non-capital. The convening authority indicated he would accept such an offer and the existence of a pending agreement, although inchoate, was communicated to the military judge and all counsel. However, all counsel and the convening authority understood that any pretrial agreement would have to be concurred in by the accused, reduced to writing, and signed by all parties. Thus, the negotiations were contingent in this respect. The option of the accused to request a bench trial, assuming amendment of charges, was not part of the negotiations and it was this option with which the defense was concerned in requesting a pretrial meeting in chambers with the military judge. On appeal, the accused alleged that during this unrecorded meeting the military judge agreed that if the accused asked to be tried by military judge alone and pled guilty, he would sentence him to confinement not exceeding 30 years. Because this meeting was off the record, we ordered a limited post-trial hearing be conducted to determine whether the accused's guilty plea was improvident because induced by a subsequently unfulfilled sentencing agreement with the military judge. *United States v. Rice*, 20 M.J. 764, ACM 23506 (A.F.C.M.R. 4 February 1983) (unpublished opinion).

Events occurring at that meeting were summarized by the hearing officer as follows:

The meeting was attended by all six counsel and the military judge and lasted about 10 minutes. The first comments were expressions of condolences to the military judge [regarding the death of his father]. Mr. Wright then explained that a pretrial agreement was anticipated with the accused pleading guilty to unpremeditated murder and aggravated assault, and the government would then move to amend the charges to conform with the pleas. The procedure involved in accomplishing this was referenced during the explanation. Mr. Wright commented that in civilian cases, it was not uncommon to discuss sentencing with

judges and if the military judge was willing to do so, he had some questions. The military judge stated that normally he did not do so but consented to the questioning. Mr. Wright then questioned the military judge. The military judge stated that he did not believe that every murderer should receive a life sentence and that he could think in terms substantially less than a life sentence depending on the extenuation and mitigation. He knew that there would be psychiatric testimony forthcoming and anticipated other forms of extenuation and mitigation. He also made reference to learning more as to the facts and circumstances of the offense. His comments were specifically directed to the case at hand. The military judge made no promises and made it clear that a sentence imposed by him would depend on the facts and circumstances and the extenuation and mitigation presented. The military judge did make a statement to the effect that "[O]ne life has been lost and I see no need to lose another." The exact timing and context of this statement is difficult to fix, but I believe it to have been in the context that the proceeding would not be a capital case. It was not intended to be nor could it reasonably have been interpreted as being a statement that he definitely would not give a life sentence in the case at hand. The discussion was then turned by Mr. Wright to what the practical equivalent of a life sentence would be in a fixed term, parole considerations being the standard for comparison. Opinions were expressed by Mr. Wright, Mr. Clancy, and probably others, and it was generally agreed that 30–35 years was a practical equivalent. During this discussion the counsel for the accused made statements that they felt the military procedure in death penalty cases would be found unconstitutional and that the defense did not wish to plead if the accused was going to receive a life sentence in any event. Throughout the meeting, the military judge expressed the position that a sentence adjudged by him would depend on the evidence submitted and specific references were made by him to psychiatric testimony and other extenuation and mitigation he anticipated receiving. He made no committment, promise or agreement to impose less than a life sentence. The impression or perception of the two civilian defense counsel as set forth in their testimony that the military judge committed himself to less than life imprisonment was not well founded and could not have been reasonably based on the statements of the military judge.

Additionally, the military judge indicated that he had been curious as to whether the evidence would show whether or not the deceased's hands were bound behind his back at the time he was strangled. He further stated that he learned that the hands were bound at the time of death.

The court reconvened shortly after the meeting. Defense counsel advised the military judge that the accused wished to change his plea to guilty of unpremeditated murder and aggravated assault. His plea was accepted, the government moved to amend the specification, striking the words "with premeditation", and findings of guilty were entered. The defense further requested that the trial proceed with the military judge alone. At the conclusion of the sentencing portion of the trial, the military judge pronounced a sentence of dismissal, confinement at hard labor for life, and forfeiture of all pay and allowances.

## II

The accused first asserts that a rehearing on sentence is required because the military judge erroneously believed that the victim's hands were tied at the time of death. We agree that the record of trial contains only limited circumstantial evidence that the victim's hands were tied at the time of death. We decline, however, to review the deliberative processes of the military judge and, therefore, resolve this issue against the appellant.

■ It is well established in the sphere of jury verdicts that the testimony of a

jury member will not be allowed to impeach the validity of the jury's verdict. *Mc-Donald v. Pless*, 238 U.S. 264, 35 S.Ct. 783, 59 L.Ed. 1300 (1915); *Mattox v. United States*, 146 U.S. 140, 13 S.Ct. 50, 36 L.Ed. 917 (1892). As stated in *United States v. D'Angelo*, 598 F.2d 1002 (5th Cir.1979):

> An attempt to use information extrinsic from the jury's verdict to 'prove its process of deliberation and find out how and why the jury reached its verdict ... is the one form of attack on a verdict that has always been forbidden in Anglo-American criminal law.'

The reason for the rule was recently summarized as follows:

> The rule represents a compromise ... [by] according deference to those important policy considerations which commend an inviolate jury process—(a) the protection of jurors against annoyance and harassment by losing parties; (b) the encouragement of free and open discussion among jurors; (c) the reduction of incentives for jury tampering; and (d) the promotion of finality in a jury's verdict.

*United States v. Blackston*, 547 F.Supp. 1200 at 1217 (D.C.S.D.Ga.1982).

This general rule was effectively codified in Fed.R.Evid. 606(b) as follows:

> Upon inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror.

Fed.R.Evid. 606(b) was incorporated into Mil.R.Evid. 606(b) with only one significant addition. The military rule added a third exception to include unlawful command influence as an appropriate subject of in-

quiry. M.C.M.1984, Appendix 22, Analysis of the 1980 Amendments, Rule 606(b), p. 22–37. Thus, in the military this general rule is subject to three exceptions: (1) when extraneous information has been improperly brought to the attention of the court members; (2) when outside influence has been brought to bear on a member; and (3) when unlawful command influence has occurred. *United States v. Accordino*, 20 M.J. 102 (C.M.A.1985); Mil.R.Evid. 606(b).

We believe that the same rule and its rationale apply to verdicts or sentences imposed by judges. Cases in which this issue is discussed are non-existent in military law and, not surprisingly, few and far between in civilian jurisprudence. We have located only a handful. See *Washington v. Strickland*, 673 F.2d 879, 693 F.2d 1243 (5th Cir.1982) (en banc), *rev'd on other grounds*, —— U.S. ——, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and cases cited therein. However, the logic of applying the same rule is irrefutable. As stated by the Fifth Circuit Court of Appeals:

> [T]here are strong policy reasons for prohibiting the use of this sort of testimony. No doubt most judges will remember the capital cases over which they have presided more clearly than cases charging lesser offenses. Yet it is unrealistic to expect that a trial judge can, using nothing more than a cold record and his own recollections, completely and accurately reconstruct his thought processes in one particular case that he decided over four years earlier. In addition to these mental gymnastics, a judge would have to push aside his natural human tendencies to justify his past actions with post hoc rationalizations. And it blinks reality to assume that a trial judge can also describe with any degree of certainty the process by which any additional information would have factored into his mental calculus had it been presented at the time of sentencing. Our society demands much of trial judges in this day

and time; it cannot, however, fairly demand that they be omniscient.

*Washington v. Strickland, supra,* at 905.

Accordingly, since the testimony of the trial judge does not fall within any of the exceptions enumerated in Mil.R.Evid. 606(b) we find it inadmissible for the purpose of impeaching his sentence. Thus, this assignment of error is without merit.

### III

■ The accused next asserts that the military judge erred by participating in an unrecorded sentencing meeting * and discussing the particular case rather than just his general sentencing philosophy, and thereby induced the accused to plead guilty and led defense counsel to believe that he would not impose a sentence in excess of 30 to 35 years. We disagree.

After reviewing the events and discussions which occurred at the 10 February meeting, as recounted by the parties at the hearing ordered by this Court, we agree with the hearing officer and find that the military judge made no promises, agreements or commitments regarding the sentence he would impose. We find that as of the morning of 10 February, the defense had come to an oral agreement with the convening authority regarding the accused's plea, although the agreement had not yet been reduced to writing or communicated to the accused. The only unresolved issue at the time of the meeting was whether the sentencing case would be presented to the military judge alone or to the panel of members. Defense counsel requested the meeting in order to acquire an impression of the military judge's sentencing proclivities. It appears from the varying recollections of those present that each participant heard only what he wanted to hear. However, we note no words or actions on the part of the military judge that would lead a reasonable person to believe that the military judge had made any promises regarding the sentence.

We further find that the military judge made no attempts to persuade, influence or induce any of the tactical decisions made by the defense. On the contrary, the defense team aggressively pursued every avenue available to them to minimize all risks at trial. They initiated the pretrial agreement with the convening authority as well as the very meeting with which we are now concerned. It is apparent that they were endeavoring to obtain as much insight as possible to make their tactical decisions. We find that the pleas of guilty and the decision to proceed before the military judge alone were not induced by any actions on the part of the government or military judge. Accordingly, based on all the evidence of record, we find this assignment of error also to be without merit.

### IV

■ The accused next contends that the military judge erred by failing to establish the providency of the guilty plea to unpremeditated murder when he was put on notice of matters possibly inconsistent with that plea. He refers to the response of the accused during the providency inquiry wherein he stated that he was hit in the head with a toaster prior to strangling the accused. The defense contends that this response was inconsistent with a plea of guilty to unpremeditated murder since it raised the possibility that the offense was committed in the heat of sudden passion caused by adequate provocation. Again, we disagree.

As noted in the government's brief concerning this issue, the argument overlooks our opinion in *United States v. Baysinger,* 11 M.J. 896 (A.F.C.M.R.1981), wherein we stated:

It is well established that if an accused, after a plea of guilty, sets up matters inconsistent with that plea, the trial judge must either resolve the inconsistency or reject the guilty plea and enter a plea of not guilty. However, *the mere*

---

* The area of pretrial conferences is now covered by R.C.M. 802. All trial participants are encouraged to adhere to its provisions, including the

Discussion, especially with regard to when matters discussed in conference must be placed on the record.

possibility of inconsistency is not sufficient; there must be some substantial indication of direct conflict between the accused's plea and alleged inconsistent statements. (emphasis added.)

Adequate provocation is defined as provocation which would excite uncontrollable passion in the mind of a reasonable man. M.C.M.1969 (Rev.), para. 198a. The accused's statement that he continued the fight and killed the deceased after he had been hit in the head with a toaster was not a substantial indication that the accused responded in the heat of sudden passion caused by adequate provocation. We therefore find that the accused's responses during the providency inquiry did not raise the issue of adequate provocation which might reduce the offense to voluntary manslaughter. Accordingly, we find no conflict between the accused's plea and his alleged inconsistent statement. *United States v. Logan*, 22 U.S.C.M.A. 349, 47 C.M.R. 1 (1973).

### V

We have considered the remaining assignments of error and resolved them adversely to the accused. *Brady v. United States*, 397 U.S. 742, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970); *United States v. Covington*, 12 M.J. 932 (N.M.C.M.R.1982). We conclude that, considering all the facts and circumstances of this case, the accused's sentence was clearly appropriate.

Accordingly, the findings of guilty and the sentence are

AFFIRMED.

CANELLOS, Senior Judge, and CARPARELLI, Judge, concur.