UNITED STATES, Appellee,

v.

James H. RICE, Jr., Second Lieutenant
U.S. Air Force, Appellant.

No. 52,924.

ACM 23506.

U.S. Court of Military Appeals.

Sept. 23, 1987.
Certiorari Denied Jan. 19, 1988.
See 108 S.Ct. 752.

For appellant: *Jay D. Terry, Esq.* (argued); *Captain Timothy J. Malloy* (on brief); *Colonel Leo L. Sergi* and *Major Alexander S. Nicholas.*

For appellee: *Lieutenant Colonel Robert E. Giovagnoni* (argued); *Colonel Joe R. Lamport* and *Major Joseph S. Kistler* (on brief); *Colonel Kenneth R. Rengert* and *Major Robert E. Ferencik, Jr.*

OPINION OF THE COURT

SULLIVAN, Judge:

During February 1982 appellant was tried by general court-martial, military judge sitting alone, at Randolph Air Force Base, Texas. Pursuant to his pleas, he was found guilty of unpremeditated murder and aggravated assault, in violation of Articles 118(2) and 128(b)(1), Uniform Code of Military Justice, 10 U.S.C. §§ 918(2) and 928(b)(1), respectively. He was sentenced to dismissal, confinement for life, and total forfeitures. The convening authority approved, and the Court of Military Review affirmed, the findings and sentence. 20 M.J. 764 (1985).

This Court granted review of the following specified issues:

I

WHETHER THE MILITARY JUDGE'S TESTIMONY AT A POST–TRIAL HEARING MAY BE USED TO IMPEACH THE SENTENCE HE HAD PREVIOUSLY IMPOSED IN THIS CASE.

II

WHETHER DEFENSE COUNSEL'S ALLEGED MISUNDERSTANDING OF THE MILITARY JUDGE'S COMMENTS AT THE UNRECORDED PRETRIAL CONFERENCE AFFECTED THE ACCUSED'S DECISION TO SEEK TRIAL BY MILITARY JUDGE ALONE.

III

WHETHER DEFENSE COUNSEL'S ALLEGED MISUNDERSTANDING OF THE MILITARY JUDGE'S COMMENTS AT THE UNRECORDED PRETRIAL CONFERENCE AFFECTED HIS THEN INCHOATE ORAL PRETRIAL AGREEMENT NEGOTIATIONS WITH THE CONVENING AUTHORITY.

We hold that none of the specified exceptions found in Mil.R.Evid. 606(b), Manual for Courts-Martial, United States, 1969 (Revised edition), permit use of this judge's post-trial testimony to impeach his adjudged sentence. Moreover, we conclude that no promise was made by the military judge, and one could not be reasonably perceived, that appellant would not be sentenced to life in prison. Finally, we hold that defense counsel is estopped from asserting any prejudice in his dealings with the convening authority resulting from the irregular, defense-initiated, pretrial conference with the military judge.

A complete rendition of the facts of this case are reported in the opinion below. *United States v. Rice, supra* at 765–67. It suffices to note that on July 6, 1981, appellant murdered a fellow officer by strangulation. This officer's death followed an altercation resulting from a perceived insult to the State of Texas and the deceased's "flipping him the finger." During

an aborted escape attempt appellant also shot at one of the Security Policemen who had blocked his escape path. Appellant was persuaded to surrender to the authorities approximately 2 to 3 hours after the police confrontation began.

Appellant was initially charged with premeditated murder and assault with a deadly weapon, with the former charge being referred as capital. Trial began on February 2, 1982, when he was arraigned, several motions were litigated, and *voir dire* of several proposed members occurred. On February 4, this case was continued until February 10 due to "a death in the military judge's family." During this time appellant and his counsel concluded a pretrial agreement with the convening authority in which appellant would plead guilty to unpremeditated murder in a non-capital case in exchange for dropping the premeditated-murder charge. The convening authority accepted this agreement with the provision that the military judge and all counsel be advised of the pending agreement, that appellant concur in the agreement, and that the agreement be "reduced to writing, and signed by all parties." 20 M.J. at 766.

Upon meeting with the military judge, the civilian defense counsel initiated a discussion regarding the judge's disposition concerning life sentences. Defense counsel intimated that civilian judges could and did discuss sentencing during meetings of this type. The military judge participated in the discussion. Furthermore, he stated his general sentencing philosophy regarding a life sentence. However, he clearly indicated to defense counsel that his decision in this case would await development of the facts presented during trial. The trial resumed shortly after this meeting, and appellant was subsequently sentenced to life imprisonment for the unpremeditated murder of Lieutenant Scherp. On appeal, appellant asserted that the military judge effectively promised to sentence him to a maximum of 30 years' confinement.

This issue was first raised 3 months after trial. The Court of Military Review, on February 4, 1983, remanded the case for a

limited post-trial hearing in order to determine if appellant's guilty pleas were improvident due to an unfulfilled sentencing agreement. After this hearing (see appendix) that court ordered a new action. When the case was finally returned to that court, it concluded that the military judge's post-trial testimony could not be used to impeach the sentence adjudged by him and that the military judge made no promises or commitments regarding sentence limitations. *United States v. Rice, supra* at 769.

### Issue I

█ Appellant urges this Court to hold that the military judge impermissibly relied on extraneous prejudicial information in sentencing appellant to life imprisonment. *See United States v. Witherspoon*, 16 M.J. 252 (C.M.A.1983); *United States v. Bishop*, 11 M.J. 7 (C.M.A.1981). In particular, appellant asserts that the judge admitted in his post-trial testimony that he sentenced appellant to life because he found that the victim's hands were tied at the time of death. Appellant contends that neither the stipulation of fact nor his *Care* *-inquiry testimony gives any support for this finding by the military judge. Accordingly, he submits that the judge must have relied on extra-record evidence for this finding, and he asks for a rehearing on sentence.

We first note that the stipulation of fact agreed upon by all parties does expressly say that the victim's hands were tied during the fatal struggle. It states:

> During this time [while appellant was in the victim's room], there was a fight. At some point during the hour, Lieutenant Rice tied Lieutenant Scherp's hands behind his back.
>
> Lieutenant Scherp screamed for help for approximately thirty to sixty seconds. These screams were heard by the person occupying the room directly above Lieutenant Scherp's room, Second Lieutenant Scott E. Miner, at approximately 0330 hours. Lieutenant Miner immediately called the Security Police.

> The Accused, at this point, with the intent to inflict grievous bodily harm, placed his arm around Lieutenant Scherp's neck in a choke hold and kept that hold until Lieutenant Scherp died.

This stipulation does not state that the victim's hands had subsequently become untied. Therefore, it is broad enough to support a reasonable inference that the victim's hands were tied at the time the fatal choke hold was applied. *See generally* E. Imwinkelried, P. Giannelli, F. Gilligan, F. Lederer, *Criminal Evidence* 65–67 (1979).

Defense counsel attempts to combine this stipulation with appellant's *Care* -inquiry testimony to establish that the victim's hands were free at the time of the victim's death. However, it only provides an inference that the victim's hands were untied at the time of death. At the *Care* inquiry, the testimony by appellant was as follows:

ACC: Sir, we were both screaming, yes, sir.

MJ: Really loud? There was a lot of noise?

ACC: Yes, sir.

MJ: What did you do at that point then?

ACC: Sir, I attempted to leave the room.

MJ: What caused you to return?

ACC: Sir, a blow to my head.

MJ: What was the source of the blow, do you know?

ACC: *Sir, I determined the source to be a toaster that I had used the cord of which just to tie the deceased with.*

MJ: *So what did you do at that point?*

ACC: *Sir, at that point, I used a stronger method of subduing the deceased.* Further, the struggle continued and, after a while, I put him in a choke hold.

MJ: With your forearm?

ACC: Yes, sir.

MJ: Around the front part of his throat, is that right?

ACC: Yes, sir.

MJ: All right. Did he subsequently go limp?

* *United States v. Care,* 18 U.S.C.M.A. 535, 40    C.M.R. 247 (1969).

ACC: Yes, sir, he did.

MJ: Now, to the best of your belief, is Lieutenant Scherp dead?

ACC: Yes, sir, to the best of my knowledge he is dead.

MJ: And, also, to the best of your knowledge, this resulted from this choke hold you put on him in an attempt to subdue during the fight?

ACC: Yes, sir, it is.

MJ: Did you intend at that time to kill him or to inflict serious bodily harm on him when you put the choke hold on him?

ACC: Sir, I did intend to commit serious bodily harm at that time.

(Emphasis added.)

Defense counsel argues that since the victim had thrown the toaster, his hands could not have been bound at that time. Moreover, he asserts that there was no evidence that his hands were subsequently retied. Accordingly, he concludes that the record established that the victim's hands were not tied at the later time of his death. Such an inference is reasonable, but it is not mandatory as a matter of law or common sense. In any event, the military judge was not required to believe the additional facts averred by appellant which were not necessary for acceptance of his pleas. *United States v. Snipes*, 18 M.J. 172, 175 (C.M.A.1984); *see generally United States v. Chambers*, 12 M.J. 443 (C.M.A. 1982); *United States v. Moglia*, 3 M.J. 216 (C.M.A.1977). As a trier of fact and sentencing body, the military judge could disbelieve appellant's self-serving testimony and conclude that the victim remained bound. Para. 76a (2), Manual, *supra. See Anderson v. City of Bessemer City*, 470 U.S. 564, 573–76, 105 S.Ct. 1504, 1511–13, 84 L.Ed.2d 518 (1985); *United States v. Williams*, 21 M.J. 360, 362 (C.M.A.1986).

Assuming the military judge disbelieved this portion of appellant's testimony, an equally reasonable scenario could be drawn from the entire record in this case. Appellant had a number of hours to rearrange the crime scene. The body of the deceased was discovered in bed with blankets partially covering the body from the chest down. The toaster, with its cord still attached, was found under the bed. Under these circumstances, a reasonable inference could be drawn that the victim was bound at the time of death, and appellant untied the victim's hands and placed the body in the bed after being surrounded by the police. Thus, we cannot say that the military judge relied on extraneous prejudicial information in concluding that the victim's hands were tied at the time of his death.

In summary, we conclude that the military judge was not asked and did not testify that extraneous prejudicial information was considered in his deliberations on appellant's sentence. *See* Mil.R.Evid. 606(b). Instead, appellant has belatedly attempted to infer such reliance from the military judge's post-trial testimony on a different matter. In view of the posture of this record, we find such an appellate tactic is no more than an attempt to accomplish the precise inquiry into the trial judge's mind which is prohibited by Mil.R.Evid. 606. *See Washington v. Strickland*, 693 F.2d 1243, 1263 (5th Cir. 1982) (en banc), *rev'd on other grounds*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *Proffitt v. Wainwright*, 685 F.2d 1227, 1255 (11th Cir. 1982), *cert. denied*, 464 U.S. 1002, 104 S.Ct. 508, 78 L.Ed.2d 697 (1983).

### *Issues II & III*

The second granted issue questions the impact of defense counsel's alleged misunderstanding of the military judge's pretrial comments on appellant's decision to seek trial by military judge alone. The third granted issue asks whether this alleged misunderstanding affected his "inchoate" pretrial agreement negotiations with the convening authority. Appellant asserts that the judge's comments which purportedly suggested that no life sentence would be imposed induced him to request trial by judge alone and discontinue his plea bargaining efforts. A similar post-trial claim concerning his decision to plead guilty was rejected as a matter of fact and law by the Court of Military Review. We agree with

that court's resolution of that question, which is also applicable to the present claims before this Court.

We particularly note that the comments of the judge were made at an irregular, unrecorded, post-arraignment conference requested by appellant's defense counsel. *United States v. Gray*, 7 M.J. 296 (C.M.A.1979); *United States v. Priest*, 19 U.S.C.M.A. 446, 42 C.M.R. 48 (1970); *cf.* R.C.M. 802, Manual for Courts-Martial, United States, 1984. In addition, appellant's civilian lawyers were assisted by military defense counsel at this meeting and throughout the entire trial. Presumably, they knew that the convening authority, not the military judge, makes sentence-limitation agreements. *See United States v. Caruth*, 6 M.J. 184 (C.M.A.1979). Finally, the military judge's comments at this pretrial conference, as well as his later statements and appellant's statements during the guilty-plea inquiry, and counsel's lack of timely objection at the announcement of sentence make clear that no deal existed or could be reasonably perceived to exist in this case. Any prejudice or detriment suffered by appellant in this context was self-induced and, accordingly, waived.

The decision of the United States Air Force Court of Military Review is affirmed.

Chief Judge EVERETT and Judge COX concur.

## APPENDIX

### FINDINGS

1. The post-trial hearing in the case of *United States v. 2dLt James H. Rice, Jr.*, 455–78–7767, directed by the Air Force Court of Military Review on 4 February 1983 was conducted at Fort Leavenworth, Kansas, on 13–14 April 1983. A verbatim transcript was prepared and is authenticated by me on this date. I reviewed the record of the trial conducted on 2–18 February 1982 and the allied documents accompanying that record including the post-trial review. Also both counsel at the limited hearing submitted summations and they are attached to this record. The submission of Jay Terry, Esq., is Hearing Exhibit 8 and the submission of Major George Cato is Hearing Exhibit 9. All of the above described documents have been considered.

2. Pursuant to the Court of Military Review opinion the following findings of fact are entered:

a. *Timing of significant events:* Negotiations with respect to a pretrial agreement began before 2 February 1982 with a series of offers from Mr. Frank Wright to plead guilty to lesser included offenses of involuntary and voluntary manslaughter made to BG (then Colonel) Rhoten, the convening authority, through the trial counsel, Major Fiore, and the staff judge advocate, Lt Colonel Penater. These offers were totally rejected by BG Rhoten before the trial began on 2 February 1982. The decision of the convening authority was duly relayed to Mr. Wright and the defense team. This series of offers and the rejection of them were not reduced to writing. The trial began on 2 February 1982 with no negotiations pending and the trial was proceeding as a capital case. A session pursuant to Article 39a, U.C.M.J., was in progress on 4 February 1982 when a recess was declared due to the illness (and subsequent death) of the father of the military judge, Colonel Kenneth Randall. Procedural matters including arraignment and entry of not guilty pleas, several motions of the defense, and *voir dire* of four panel members had been accomplished at the time of the recess. The trial was scheduled to resume on the morning of 10 February 1982 with a continuation of *voir dire* of panel members. On 8 February 1982 during a telephone conversation between Mr. Wright and Major Fiore on other matters, a discussion occurred regarding plea negotiations. Major Fiore considered the discussion to be an offer to plead guilty to unpremeditated murder and aggravated assault in return for thegovernment amending the charges to conform with such pleas. The principal effect would be to make the case non-capital. Major Fiore contacted Lt Colonel Penater and a meeting with the

convening authority was set for 9 February 1982. The offer was presented to the convening authority on 9 February 1982 and he stated he would advise them of his decision later in the day after returning from a scheduled flight. The convening authority decided to accept the offer and advised his staff judge advocate of his decision that same day. The SJA informed Major Fiore of the decision also on 9 February shortly after Colonel Randall's return to San Antonio and advised him that plea negotiations were in progress and that there was no need to begin the proceedings early in the morning of 10 February as scheduled. Major Fiore probably informed one of the defense counsel of the convening authority's decision on the 9th also, but in not, did so on the morning of the 10th before the meeting between counsel and the military judge. I find that all counsel and the convening authority understood that any pretrial agreement would have to be concurred in by the accused and thereafter reduced to writing and signed by the parties. Thus the negotiations were contingent in this respect. An agreement as contemplated would enable the accused to submit a request for trial before the military judge alone and counsel were aware of this effect and comments were made regarding such a possibility. However, such a request was not a term of the negotiations and was understood by all counsel to be a separate matter. Thus at the time of the 10 February meeting between all counsel and the military judge, a pretrial agreement had been negotiated subject to acceptance by the accused to plead guilty to unpremeditated murder and aggravated assault and for the government to amend the charges in conformance therewith. The agreement had not been reduced to writing nor signed by any parties nor had a stipulation of fact been signed although a stipulation was in the process of being prepared. The option of the accused to request a bench trial, assuming amendment of charges, was not part of the negotiations, and it was this option that the defense counsel were concerned with in requesting the meeting.

b. *The 10 February meeting:* The meeting was attended by all six counsel [the three military trial counsel, the trial defense counsel, Mr. Wright and Mr. Clancy] and the military judge and lasted about 10 minutes. The first comments were expressions of condolences to the military judge. Mr. Wright then explained that a pretrial agreement was anticipated with the accused pleading guilty to unpremeditated murder and aggravated assault, and the government would then move to amend the charges to conform with the pleas. The procedure involved in accomplishing this was referenced during the explanation. Mr. Wright commented that in civilian cases, it was not uncommon to discuss sentencing with judges and if the military judge was willing to do so, he has some questions. The military judge stated that normally he did not do so but consented to the questioning. Mr. Wright then questioned the military judge. The military judge stated that he did not believe that every murderer should receive a life sentence and that he could think in terms substantially less than a life sentence depending on the extenuation and mitigation. He knew that there would be psychiatric testimony forthcoming and anticipated other forms of extenuation and mitigation. He also made reference to learning more as to the facts and circumstances of the offense. His comments were specifically directed to the case at hand. The military judge made no promises and made it clear that a sentence imposed by him would depend on the facts and circumstances and the extenuation and mitigation presented. The military judge did make a statement to the effect that "One life has been lost and I see no need to lose another." The exact timing and context of this statement is difficult to fix but I believe it to have been in the context that the proceeding would not be a capital case. It was not intended to be nor could it reasonably have been interpreted as being a statement that he definitely would not give a life sentence in the case at hand. The discussion was then turned by Mr. Wright to what the practical equivalent of a life sentence would be in a

fixed term, parole considerations being the standard for comparison. Opinions were expressed by Mr. Wright, Mr. Clancy, and probably others, and it was generally agreed that 30–35 years was a practical equivalent. During this discussion the counsel for the accused made statements that they felt the military procedure in death penalty cases would be found unconstitutional and that the defense did not wish to plead if the accused was going to receive a life sentence in any event. Throughout the meeting, the military judge expressed the position that a sentence adjudged by him would depend on the evidence submitted and specific references were made by him to psychiatric testimony and other extenuation and mitigation he anticipated receiving. He made no commitment, promise or agreement to impose less than a life sentence. The impression or perception of the two civilian defense counsel as set forth in their testimony that the military judge committed himself to less than life imprisonment was not well foumded and could not have been reasonably based on the statements of the military judge.

c. *Trial counsel participation:* All parties had put considerable effort into preparing for the case and were intensely involved. All recognized that the meeting was unusual and that there were hazards, thus comments were guarded and sometimes indirect. The concerns, understandings, and objectives of the participants were different during the meeting. All parties understood that an agreement had been negotiated as to pleas between counsel and the convening authority. The defense counsel had not yet obtained concurrence of the accused and they would shortly be presenting the agreement to him. They were attempting to gather as much information as possible to present to him. All parties recognized that plea bargains are not final until the case was completed, thus all recognized that the agreement could fall out. This was especially true for the military participants who were more acutely aware of the military proce-

dure and requirements as to guilty pleas and pretrial agreements. Defense counsel were concerned with the question of a jury versus bench trial and had not yet made a decision on that matter. The military judge believed there would be a request for trial before judge alone. He wished to assure the defense that he was not "locked into" a life sentence and that a sentence imposed by him would depend on the evidence and matters presented. The trial counsel recognized that the defense was addressing that issue and that the defense had not yet made a decision as to it. They viewed the meeting as unusual and were very concerned with what was said by all parties. Their interests were to be present to keep the meeting from being *ex parte* and to monitor what occurred. Trial counsel made no significant substantive input in the conversation. All three trial personnel were emphatic in their beliefs that the military judge made no commitment as to sentencing and that the maximum imposable sentence had not been reduced to something less than life imprisonment. At no time during the trial did they believe that there were any deals or understandings outside of the formal agreement and they felt the inquiries of the accused as to the plea and pretrial agreement were adequate and appropriate. I find their beliefs to be reasonable and well-founded. The presentation of the prosecution during the sentencing phase of the trial was aggressive and most vigorous and obviously they were seeking the maximum imposable sentence.

d. *Defense objections first raised:* Mr. Wright and Mr. Clancy testified that they immediately believed the military judge had failed to abide by a commitment when the sentence was announced. There is no evidence that their feelings were made known by them or the accused to the prosecution team, the military judge, Randolph AFB SJA, convening authority or anyone else in a position of authority regarding the trial before the matter was referred to in the *Goode* response. Mr. Wright and Mr. Clancy apparently took no further action regarding the case other than prepare Exhib-

it 5. They considered themselves to be "on the case" until 23 or 24 February 1982. The hiring of civilian counsel for appellate purposes was contemplated by or on behalf of the accused in March 1982. Negotiations were begun with Mr. Goldstein by at least 9 March and the military defense counsel was informed by Mr. Goldstein that he had been retained on 19 March. A letter from Mr. Goldstein in the post-trial review (p. 33) indicates he was hired on 18 March by the accused's family.

ALLAN C. SMITH, Colonel, USAF

Military Judge